STATE OF MAINE
OXFORD, ss.

LESLIE GAMMON,
       Plaintiff

    v.

THOMAS P. TREMBLAY and
GAIL W. TREMBLAY,
       Defendants

   and

J. EMILY FOSTER,
       Counter-claimant



RECEIVED AND FILED

MAY - 2 2002

Donna L. Howe
CLERK OF COURTS

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-00-041
EAG - UYR - 5/2/2002

ORDER

DONALD L. GARBRECHT
LAW LIBRARY

MAY 8 2002

PROCEDURAL HISTORY

This case was initiated by Leslie Gammon to establish the boundaries of

parcels of land located in the Town of Waterford. In the complaint he filed on

September 27, 2000, Mr. Gammon asserted that he, J. Emily Foster, Harlan Johnson,

and Stephen Brown owned three abutting parcels in Waterford, and that there was a

dispute concerning their respective and common boundaries. Mr. Gammon also

asserted that defendant Foster had trespassed upon and damaged his land.

Ms. Foster responded to the complaint by filing a motion for substitution of

parties on October 5, 2000, and an answer and counterclaim for slander of title the

following day. In her motion, Ms. Foster stated that she had sold the property in

question to Thomas and Gail Tremblay. Ms. Foster's motion was granted without

objection on October 17, 2000, and the Tremblays filed their own motion for

substitution on November 1, 2000. In that motion, they informed the court and the

plaintiff that they now owned both Ms. Foster's parcel and the parcel once owned by Messrs. Johnson and Brown. Without objection, the Tremblays' motion was granted on November 1, 2000. The Tremblays also received permission to file an amended counterclaim that included claims of statutory and common law trespass and slander of title against Mr. Gammon. Finally, Mr. Gammon was granted permission to withdraw his trespass claim.

A trial on all claims was held at the Oxford County Superior Court in South Paris on March 5 and 6, 2002. During the trial, testimony was taken from John Belding, Leslie Gammon, Gary Inman, Brenda Birney, Lewis Williams, Fred Foster, Jessica Emily Foster, Thomas Tremblay, John Belding, and Herbert Franklin Foster. In addition, the plaintiff admitted four photographs, copies of the worksheets prepared by surveyors Inman and Belding, and a letter written by Mr. Gammon to Mainely Properties. Ms. Foster admitted into evidence the sales contract between herself and the Tremblays, and the settlement statement from that transaction. The Tremblays admitted defendants' exhibits 1, 2, 3, 4, 5i, 6, 7, 8b, 8c, 9, 10, 14, 15, 16, 17, 18a, 18b, 21b, 21c, 21d, 22, and 26. The parties placed three stipulations on the record and, finally, the court went onto the land and saw the various claimed monuments and pins. At the conclusion of the trial, counsel requested additional time to submit memoranda of law. Those were all received by March 22, 2002.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 6, 1890 Acsah A. Patterson acquired all of the land now owned by the Tremblays, as well as the disputed parcel, from Winslow Bisbee. Four years

later, on May 1, 1894, the land now owned by Mr. Gammon, excluding the disputed parcel, was deeded to Charles Gammon by Mary Ames. On June 24, 1895, Charles Gammon deeded that property to Acsah's husband, Samuel Patterson. The deeds of the side-by-side properties owned by Acsah and Samuel Patterson describe a common boundary that has been accepted as the "historical" boundary by all parties. That boundary runs approximately 1650 feet from Route 37 along a range line to the shore of McWain Pond. The remains of a stone wall are still present for approximately 200 feet of the northern half of that line. It is this boundary that lies at the heart of this dispute.

Acsah Patterson died intestate on June 24, 1900, and her property passed to Samuel. On July 9, 1900, Samuel transferred what had been Acsah's property to Joseph Patterson. That property was then transferred at least four times between 1900 and 1965, when it was acquired by Frederick and Elizabeth Foster, parents of Emily, Fred, and Herbert Foster. At no time during any of these transfers was the description of the boundary in question changed.

In 1969, after her husband died, Elizabeth Foster deeded one small lakefront lot to Herbert, and another to Emily. Herbert's lot abutted the Gammon lot to the east, and Emily's lot to the west. In 1973, Elizabeth transferred the remainder of her property to Emily, keeping a life estate for herself. Again, the description of the boundary in dispute was never changed in any of these transactions.

Herbert Foster mortgaged his property in October 1993, and soon defaulted on the payments. A foreclosure action was begun in 1997 and, in an order dated March

5, 1998, the Superior Court (Oxford County, *Calkins, J.*) granted judgment to KeyBank. Herbert failed to redeem the property within ninety days, and KeyBank sold the parcel to Harlan Johnson and Stephen Brown on August 18, 1998. Johnson and Brown sold it to the Tremblays on October 27, 2000. Emily Foster had already sold all of her property to the Tremblays on September 29, 2000.

The land now owned by Mr. Gammon, without the disputed area, was transferred from Samuel Patterson to Ida Gammon in a deed dated October 23, 1906. The Registry Book number was not supplied to the court, but the page is 551. Sometime thereafter, Ida apparently transferred this property, along with other parcels, to her husband Charles, their children Violet, Hyacinthe, Beatrice, and Gerald, and to Ora Gammon Millett. In 1925 Charles, Violet, Hyacinthe, Beatrice, and Gerald deeded their interests in what had been Ida's property to Raymond Gammon; twenty-seven years later, in 1952, Ora did the same. None of the deeds admitted into evidence changed the description of the boundary in question, or of the parcel itself.

Although Mr. Gammon was born and raised in his family's homestead, he did not become its owner until 1998, after the death of his father, Raymond Gammon. Mr. Gammon moved out of his parents' home in 1957 or 1958. He lived across the road for the next forty years, and returned to his family's home approximately five years ago. Mr. Gammon testified that he walked the boundaries of what was to become his land with his grandfather, Charles Gammon, in

approximately 1950[1] and that, at that time, he saw a wooden stake in a pile of stone at the spot he now claims marks the terminus of the boundary line. Mr. Gammon also testified that, between 1950 and 1975, he and his father cut firewood on the disputed parcel, and that they cut right to the line he claims as the boundary.

According to Mr. Gammon, the Fosters also cut firewood during the late 1950s and 1960s, but only after he, his father, and Fred Foster had walked the boundary and "marked" the line with sticks. The aerial photograph admitted as defendants' exhibit 18A was taken in 1953; it shows large pieces of cleared ground or meadow on the Foster property.

In addition, Mr. Gammon testified that in 1968, he and his father helped Elizabeth and Frederick Foster measure along the shorefront to establish the small lots that were eventually deeded to Emily and Herbert. He recalled that all of them agreed that the wooden stake in a pile of stone marked the boundary, and that they used the stake to begin their measurements.

The Gammon land was historically used as a cattle and poultry farm. Raymond Gammon continued to keep chickens until approximately 1975, and even today portions of a barbed wire fence used to contain the cattle still exist at various points along the historic boundary.

Throughout the last decades, the tax map for the Town of Waterford has depicted the disputed parcel of land as part of the Foster parcel, and the Fosters have

---

1. If accurate, this walk occurred before Ora Millett transferred her interest to Charles Gammon.

been billed for all taxes. Because it contains waterfront, the disputed land has been taxed at the Town's higher rate. Between 1990 and 1996, Mr. Gammon was a Selectman for the Town and, in that capacity, was responsible for the assessment of taxes, based upon the tax map. Despite his familiarity with the tax map, Mr. Gammon testified that he never noticed that it contained what he deemed to be an inaccurate boundary line. Ms. Foster or her mother paid all of the taxes on the disputed lot during the past thirty-five years.

Mr. Gammon testified that he first became aware that there was a dispute about the boundary line in the fall of 1997. In August 1998, he went to the auction of Herbert Foster's property and announced that the location of the lot was in question, and that he "owned the beach." Between 1997 and 2001, Mr. Gammon also spoke with every surveyor who appeared on the property and, in August 2001, he notified Ms. Foster's broker by telephone and by letter that the parcel's boundary was disputed. Mr. Gammon also painted blazes on trees to "mark" his claimed boundary in approximately 1997.

The only non-retained and unconcerned witness presented was Lewis Williams. As a boy Mr. Williams spent summers next to the Foster land, and he recalled being told by Frederick Foster in 1955 or 1956 that, if he walked along the shorefront, he would be on Gammon land when he got to the barbed wire. As noted on all of the surveys, the barbed wire is east of the historic boundary.

Fred Foster lived with his mother and brother at the Foster family homestead from 1954 until 1972. While he was growing up, he and his siblings had frequent

conversations with their parents about the boundary, because the elder Fosters were wary of trespassing on Gammon land. Mr. Foster recalled that the barbed wire fence and the big rock where the boat was launched were the markers of the line. Both of these were—and are—east of the historic line. After Elizabeth Foster died in 1997, Fred frequently saw his brother Herbert moving around pins to mark boundaries. Mr. Foster did not then pay too much attention to Herbert's actions.

Emily Foster, born in 1939, lived on the Foster land from 1940 until 1953, then moved to South Paris and Norway to attend high school. While in school and for years after, she returned to her parents' home to visit several times each week. The visits ended on Christmas of 1968, and Ms. Foster did not return to the property until after her mother's death in 1997. As mentioned above, Ms. Foster has been the legal owner of most of the Foster land since 1973.

Ms. Foster recalled walking the boundary of her family's land in 1950 with her grandmother, Sarah Walker, her father, Frederick Foster, and the abutting neighbors, Raymond Gammon and John Pike. Her grandmother wanted Emily and her brothers to receive lakeshore lots when they turned 21, so the purpose of the perambulation was to establish the perimeters of those lots. Ms. Foster testified that her father had measured two 150 feet x 120 feet lots for herself and Herbert, and that he had marked the corners of the lots with wooden stakes. Ms. Walker died in 1951. The lots were transferred to Emily and Herbert in 1969.

Ms. Foster also recalled that her father sold two camp lots in the 1950s, and that Dana Douglas, the surveyor hired to survey those lots, had restaked the lots

created for herself and Herbert. No one has been able to produce any of the surveys or notes prepared by Mr. Douglas.

In 1997, Emily Foster retained Gary Inman to survey her whole property, in preparation for placing it on the market. During his first inspection in 1997, Mr. Inman did not find the pipe that marked the terminus of Mr. Gammon's claimed boundary line. He did find a pipe or post just east of the terminus of the historic line on that first visit, but found it missing when he returned a few weeks later. Mr. Inman agreed that there appeared to be a cut line at the middle section of the boundary, but found no monument to mark the terminus of the cut line. There was also the remains of a stone wall consistent with the historic boundary, and portions of a barbed wire fence parallel to and east of the historic boundary.

Mr. Inman spoke with Mr. Gammon during at least one of his inspections in 1997, and at no time did Mr. Gammon mention a stake or pipe in a pile of stone. Mr. Inman had serious concerns about the accuracy of the various pipe and stakes found, based upon Ms. Foster's report that they had been moved, and his own experience with the missing pipe.

Based upon the monuments he found, the deed descriptions, and his conversations with Ms. Foster and Mr. Gammon, Mr. Inman determined that the boundary was as described in the deeds.

John Belding, the surveyor hired by Mr. Gammon, testified that he began his investigation in 2001 by speaking with Mr. Gammon. During his subsequent inspections of the parcels, he found various pins and/or iron markers, including an

old 3/4 inch iron pipe at the terminus of the historic boundary, the 3/4 inch iron pipe Mr. Gammon says he set to mark the terminus of the line he claims, an old angle iron found under a brick 119.17 feet along the lake front from that pipe, and a third 3/4 iron pipe 125 feet along the lake front from the angle iron. Based upon the monuments he found, the signs of habitation on what he asserted was the Herbert Foster lot, a line of forestation, and the information he received from Mr. Gammon, Mr. Belding testified that the line claimed by Mr. Gammon is the boundary between the Gammon and Tremblay land. Mr. Belding did not speak with Ms. Foster during his investigation of the boundary.

In July of 2001, Ms. Foster agreed to sell all of her land to the Tremblays for $175,000; and the closing was scheduled for the last of August. However, after Mr. Gammon told the realtor and the Tremblays that he owned a portion of the property, the Tremblays withdrew their offer. They finally settled upon a reduced price of $160,000, with the provision that the Tremblays would litigate the boundary dispute.

1. Boundary by Acquiescence

Mr. Gammon has asserted that, at some unspecified time, either while the parcels were owned by Acsah and Samuel Patterson, or while they were owned by his grandfather and Frederick and Elizabeth Foster, the boundary line was changed by acquiescence. In order to prevail on this claim, Mr. Gammon must prove, by clear and convincing evidence, the following elements:

> 1) possession up to a visible line marked clearly by monuments, fences or the like;

2) actual or constructive notice to the adjoining landowner of the possession;

3) conduct by the adjoining landowner from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred;

4) acquiescence for a long period of years such that the policy behind the doctrine of acquiescence is well served by recognizing the boundary.

*Crosby v. Baizley*, 642 A.2d 150, 154 (Me. 1994), citing *Davis v. Mitchell*, 628 A.2d 657, 660 (Me. 1993). Mr. Belding testified that a visible line was established by the cutting line, a stake in a pile of stone found at its terminus, and other pins found on the Foster land. Given the evidence presented at trial, the court cannot accept this opinion as accurate.

Because the Gammons and the Fosters both cut trees on their abutting properties, the difference in the tree canopy neither supports nor undermines any claimed boundary. The trees may have been cut in one area that was slightly higher and drier, and not cut elsewhere because of swampy conditions. In addition, it is not at all clear who cut in which areas, or when the trees were cut.

The monument located at the terminus of the line claimed by Mr. Gammon (#6 on Belding survey) was, by Mr. Gammon's testimony, placed there by him in approximately 1990, before he owned the property. That monument was not present when Mr. Inman completed his survey work in 1997, and its legitimacy is, at best, questionable. If the pipe replaced a stake, that stake might have been placed by Frederick and Elizabeth Foster to mark the boundary between the lots that were to go to Emily and Herbert.

Belding monuments #10 and #11 are dissimilar enough from the other pins found to raise some doubt about their age and pedigree, especially in light of the

evidence about moving pins. The Law Court does not mandate reliance on monuments when their provenance is in question:

> We have recognized that artificial monuments are easily removed, and when their reliability is in question reference to them may be eliminated by a court locating a boundary in a declaratory judgment action.

*Baptist Youth Camp v. Robinson*, 1998 ME 175, 714 A.2d 809, 813.

According to Fred Foster, Belding marker #12 was placed by his brother Herbert sometime after 1997. When Herbert Foster attempted to take possession of the lot Mr. Belding has identified as "formerly Herbert Foster," at approximately the same time, his sister initiated an action to evict him from what she claimed was her property. Mr. Herbert Foster did not respond to the lawsuit, and never asserted to the court that he owned the land. On June 29, 1998, the South Paris District Court granted Ms. Foster a writ of possession for the property occupied by Herbert Foster.

Given his inaction at a time when his own property rights were in question, and given the credible statements made by Fred Foster about his brother's manipulation of the pins and monuments, the court did not find Herbert Foster to be a credible witness in this case. Because the monuments he relied upon were of questionable authenticity, because Herbert Foster's trespass is not acceptable evidence of legitimate habitation, and because meaning of the cutting line is ambiguous, the court cannot find, by clear and convincing evidence, that Mr. Gammon has established a "visible line marked clearly by monuments, fences or the like."

The only evidence presented concerning the Fosters' notice of and acquiescence to the changing of the boundary was Mr. Gammon's testimony about statements or actions made by the elder Fosters while laying out the lots for Emily and Herbert. Ms. Foster had her own specific memory of that day, and it differed in significant detail. Ms. Foster's recollection is supported by her family's record of paying all taxes assessed on this property.

Based upon the evidence presented the court cannot find, by clear and convincing evidence, that Mr. Gammon has established either actual or constructive notice to the Fosters or conduct by the Fosters from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred.

At one point during the trial, Mr. Gammon's attorney asserted that the boundary may have been changed by acquiescence while both parcels were owned by Acsah and Samuel Patterson. If they had agreed to change the boundary, for whatever reason, however, that change would have been documented the next time either parcel, with its "new" boundary, changed hands by deed.

His alternative assertion that the agreed-to boundary change occurred between the Fosters and Charles or Raymond Gammon in the 1950s or 1960s simply makes no sense. By all accounts, the Fosters were anything less than wealthy, and may have had to log some wood in order to cover the funeral expenses of Sarah Walker. They were in no position to simply "give up" a portion of their largest asset, especially if they would not receive any benefit, and would still have to pay

the taxes. Although a motive for or reason behind the decision to give up some land is not an element that must be proven, a logical explanation would be helpful.

2. Adverse Possession

Mr. Gammon has alternatively argued that he and his predecessors obtained the disputed property by adverse possession. In order to prevail on that claim, he must establish that he and/or his predecessors were in "actual, open, notorious, hostile, under a claim of right, continuous, and exclusive for a period of twenty years." Mr. Gammon must establish these elements "by clear proofs of acts and conduct fit to put a man of ordinary prudence, and particularly the true owner, on notice that the estate in question is actually, visibly, and exclusively held by a claimant in antagonistic purpose." *Cates v. Smith*, 636 A.2d 986, 988 (Me. 1994) (citations omitted). Actual possession of the land is established by evidence that the claimant used and enjoyed the land in the same manner one would expect of the average user. *Emerson v. Maine Rural Missions Ass'n, Inc.*, 560 A.2d 1 (Me. 1989). The land at issue here is scrub forest and vegetation. Other than some woodcutting, there has been no real use by the Gammons. There was no evidence the land was used for either poultry or cattle farming, or that the beach had been cleared for access to the water. On this record, the court cannot find that the use alleged by Mr. Gammon is sufficient to establish title by adverse possession.

3. Slander of Title

In order to prevail on their slander of title claims, Ms. Foster and the Tremblays must prove, by a preponderance of the evidence, that:

(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.

*Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996). Although Mr. Gammon made one possibly slanderous statement, the "slander" was not against property then owned by Ms. Foster or by the Tremblays. Mr. Gammon admitted that he stated that he "owned the beach" at the auction of Herbert Foster's property. That false statement might have affected the sale price received for Herbert's property, but no evidence was presented on that issue. There was also no evidence that the statement affected the price of Ms. Foster's property. In fact, it was not until Mr. Gammon wrote to Ms. Foster's realtor, after an agreement was reached between Ms. Foster and the Tremblays, that there was any "damage" to the value of the property. Ms. Birney testified that, during their telephone call on August 23, 2000, Mr. Gammon asked her if she were aware of a boundary dispute. When she replied that she was not, he told her that he, rather than Ms. Foster, owned all of the waterfront. In an effort to have the issue resolved, Mr. Gammon retained an attorney and filed this action

Telling a realtor that there is a dispute about the boundaries of a property she is selling does not, without more, give rise to a claim of slander of title. Mr. Gammon had a good faith, albeit misplaced belief that the boundary was somewhere it was not. Based upon the evidence submitted at trial, the court finds that Ms. Foster has failed to prove malice.

4. Trespass

The Tremblays acquired ownership of the disputed parcel in September and October of 2001. There was no evidence presented of any trespass by Mr. Gammon after that date.

## ORDER

Based upon the evidence presented, the court has determined the common boundary between the land now owned by the Tremblays and the land owned by Leslie Gammon is the historic, straight line beginning at a 1 1/4 inch iron pipe capped, "2078," found in a corner of a stonewall on the southerly side of Route 37, so-called; Thence, South 24 degrees-37 minutes-41 seconds East, along land conveyed to Leslie R. Gammon by a deed recorded in Book 2421, Page 222 in the Oxford County Registry of Deeds, a distance of one thousand six-hundred sixty-six and twenty hundredths (1666. 20) feet to a 3/4 inch iron pipe and near the high-water line of McWain Pond, so-called, said pipe being at or near the southwesterly corner of land of said Leslie R. Gammon.

Judgment is granted to Mr. Gammon on the counter-claims brought by Ms. Foster and the Tremblays for slander of title and trespass.

This Order is to be incorporated into the docket by reference, in accordance with M.R. Civ.P. 79(a).

DATED: May 1, 2002

_____
Ellen A. Gorman
Justice, Maine Superior Court

Date Filed __09-27-00__     __OXFORD__     Docket No. __RE-00-41__

County

Action __BOUNDARIES TRESPASS__

THOMAS P. TREMBLAY AND
GAIL W. TREMBLAY,

LESLIE GAMMON            vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| THEODORE KURTZ ESQ<br>KURTZ & PERRY<br>PO BOX J<br>SOUTH PARIS   ME 04281 | DANA HANLEY ESQ      (Emily Foster)<br>HANLEY & ASSOCIATES<br>PO BOX 280<br>SOUTH PARIS ME 04281 |
| | ELLIOTT EPSTEIN ESQ    (Atty for Tremblays)<br>ISAACSON & RAYMOND<br>PO BOX 891<br>LEWISTON ME 04243-0891 |

| Date of Entry | |
|---|---|
| 09-27-00 | Complaint Summary Sheet filed. $120.00 filing fee received. |
| 09-27-00 | Complaint filed. |
| 09-27-00 | Summons served on Stephen Brown on Waterford Rd in hand by the Sheriff's Dept on 09-21-00. |
| 09-27-00 | Summons sereved on J Emily Foster @ 28 Deering St in hand by the Sheriff's Dept on 09-19-00. |
| 09-27-00 | Summons served to Harlan L Johnson @ 542 Harrison Rd in hand by the Sheriff's Dept on 09-19-00. |
| 09-27-00 | Case File Notice mailed to T. Kurtz Esq. |
| 10-05-00 | Def. Emily Foster's Motion for Substitution of Parties filed. |
| 10-06-00 | Def. J. Emily Foster's Answer & Counterclaim filed. |
| 10-17-00 | Order on Substitution of Parties filed. Dated 10-17-00 Signed by Fritzsche, J. Copies mailed to T Kurtz Esq, D Hanley Esq & Elliott Epstein Esq. |
| 10-19-00 | Pltff's Reply to Counterclaim of Def Foster filed. |
| 10-27-00 | Scheduling Order filed. Discovery deadline is June 6, 2001. Dated: October 27, 2000, Gorman, J. |
| 11-01-00 | Copy mailed to T. Kurtz, Esq., D. Hanley, Esq., and E. Epstein, Esq. Def.'s Motion for Substitution of Parties filed. |